DAVISON *v.* CITY OF ANN ARBOR.

WATERS AND WATERCOURSES—INJUNCTION—OPERATION OF MUNICI-
PAL WELLS—EVIDENCE JUSTIFIES DISMISSAL OF BILL.

In a suit to enjoin the city of Ann Arbor from pumping
water from its wells, and for damages for injury alleged
to have been done to plaintiffs' lands from such pumping,
evidence reviewed, and *held*, to justify the decree of the
court below dismissing the bill of complaint.

Appeal from Washtenaw; Sample (George W.), J.
Submitted October 6, 1926.    (Docket No. 13.)    De-
cided February 4, 1927.

Bill by Carrie Davison and others against the city
of Ann Arbor to enjoin the operation of municipal
wells, and for an assessment of damage caused thereby.
From a decree dismissing the bill, plaintiffs appeal.
Affirmed.

*Arthur Brown* (*Henry B. Graves*, of counsel), for
plaintiffs.

*Roscoe O. Bonisteel*, City Attorney (*Cavanaugh &
Burke*, of counsel), for defendant.

SNOW, J.    The source of water supply for the city
of Ann Arbor and the University of Michigan is 19
wells, about 40 feet deep and some 200 feet apart,
located on the city's land, known as the Steere farm,
in the township of Pittsfield, Washtenaw county, about
3 miles south of the city.    The pumping station was
erected and pumping begun in 1919, although much
testing had been done prior to that time.    It has been
since then, and still is, in operation, supplying the people
something like 2,500,000 gallons of water per day.    The

[1]Waters, 40 Cyc. p. 632.

wells are in low, level, muck ground, suitable especially for growing celery, onions, etc., and carrying on what plaintiffs term "intensive farming." Plaintiffs, 17 in number, own 481 acres of muck land in the depression in the vicinity of the wells. They filed their joint bill of complaint in August, 1920, praying that the city be enjoined from pumping water from its wells, and for the assessment and payment of damage to them for injury done to their respective lands from such pumping. There was unavoidable delay in the trial of the case, and it was not finally disposed of until August, 1925, when a decree dismissing the bill of complaint was entered. From this decree plaintiffs appeal. For the most part only questions of fact are involved.

Briefly, plaintiffs claim that before pumping began their lands had a water table close to the surface which was fed by springs and flowing wells which in many places came through the underlying strata from the underground water; that this made the land very valuable for agricultural purposes, but, when the defendant began pumping, the underground water source was so depleted that it dried up the springs, stopped the flowing wells, and lowered the water table in the muck land, thereby making it practically worthless for any purpose whatever. This claim is denied by the defendant *in toto,* and after an extended trial and a personal view of the premises, the chancellor determined that the wells in the vicinity which ceased flowing did so from natural causes; that no damage had been done to plaintiffs; that their crops were still as good, if not better, than crops elsewhere, and that the land remained fertile and productive.

In entering upon the consideration of the case, we are constrained to pass, without decision, two important questions which confront us naturally at the very beginning. Defendant claims, and the chancellor

so held, that the bill of complaint was multifarious and that plaintiffs' remedy, if any, was by separate actions at law, in individual suits.   A decision of these questions might dispose of the case.   But it has been tried and concluded upon the issues of fact framed by the pleadings.   It has, without doubt, been an expensive contest for all concerned.   Further litigation should be avoided.   We shall, therefore, attempt a final disposition of the case upon the equities.

The record is of large volume, and to quote from it extensively would render our opinion of too great length, without benefit to the parties or profit to the profession.   We have, however, given it careful consideration, and call attention to some of its more salient and controlling features.   Although counsel for plaintiffs greatly deprecate the testimony of experts called by the defense, and claim it to be in conflict with established facts, we incline to regard such testimony as most important, especially in view of the fact that there is little contended for by either party which may be said to have been established by uncontradicted evidence.

Prof. L. J. Young, a teacher of forestry in the University, and apparently possessed in large measure of practical and scientific knowledge of land of the character under consideration and of its possibilities, testified that in the area surrounding the pumping station there was a layer of muck varying in thickness, under which there was a very thick clay cap about 15 feet at the pumping station, *which was impervious to the movement of water,* and below that, a thick bed of water-bearing gravel from whence the water was pumped by the city.   He testified that there was no interchange of water between that percolating down through the muck and that in the gravel bed below the clay, either way, up or down, and that it was a physical impossibility for the re-

moval of the water from below to produce any effect upon the upper water table which supplied the surface of the soil.

This testimony was corroborated by L. E. Ayres, a civil engineer graduate of the University. This witness is a resident of Ann Arbor and took many observations of the entire system. He testified, with reference to the water actually pumped by the city, that the radius of influence of the city's wells from their location was not to exceed 600 or 800 feet, and that water after being pumped returned at a very rapid rate. He testified also that the pumps were small as compared with the area and the amount of water available, and gave the following illustration:

"If you should draw a circle two miles in radius, just about reaching the outer limits of the farms of the complainants, and if in that circle there were a lake, and you should put these so-called power pumps on that lake and pump continuously 30 days at the rate of 3,000,000 gallons a day, which is more than the present average, and no water came into that lake, and none was taken out by any other means, that lake would be lower one-third of an inch in 30 days."

And he testified, further, that an examination of the wells on the Steere farm to the north and an actual measurement with a rule of the flow of the water over the top of the pipe, disclosed no difference in the water when the pumps were operating and when they were not.

If the testimony of these men is accepted, one must of necessity conclude that the pumping of water from the lower table has not and cannot effect injury to the land on its surface. It seems to us that there should be but little difficulty, purely from a scientific standpoint, to determine this apparently very simple proposition. If, however, it is not a matter for scientific assistance, it would have been a simple thing for the plaintiffs to have established that fact by ex-

perts; or if defendant's experts were wrong, then to have established that fact. There was but little attempt in this direction. A Mr. Levin, in the soils department of the Michigan State College, was called by the plaintiffs. His testimony was interesting and important, but he was unable to give an expert opinion as to what effect, if any, upon the adaptability of this muck land for intensive farming, continued pumping by the city and a lowering of the water table would have.

Prof. Paul M. Harmer, muck specialist at Michigan State College, witness for plaintiffs, gave testimony to the effect that the Steere farm was a very good muck quality, and that there was heavy soil four or five feet underneath the surface, but that it was not tested. He gave no explanation of the character of the soil underneath the surface muck, nor its condition relative to water tables below.

Witnesses Vanderveen and Hassing, characterized by counsel for plaintiffs as "muck land specialists from Kalamazoo," testified to the injury to muck land from the removal of underground water by pumping. But they gave no explanation of how the surface water could be pumped from the soil by pumps which extended below a considerable thickness of clay, impervious to water.

Supporting the opinion evidence offered by defendant, many witnesses testified to the fact that they could find no damage done the lands of plaintiffs by the pumping of the city's water. On the various phases of the condition of and injury to the lands of plaintiffs, we find:

F. E. Leverett, a practical farmer of many years' experience, examined the land of plaintiffs and testified to the growth of bountiful crops, the thriftiness of the trees, and the excellence of the pasture for land of that character. He stated that in his opinion the pumping by the city at its station on the Steere farm

had caused no injury or damage whatever to any of plaintiffs' land. E. B. Manwaring, 71 years old, a fruit grower and farmer of long experience, testified there was absolutely no damage to the lands for agricultural purposes.    John J. Wood, a life-long farmer, after inspection of plaintiffs' lands on various occasions, concluded "everything looked very fine."    This witness claimed the land was not dry, but too wet, and that it needed tiling very badly.    Horatio J. Abbott, postmaster, former register of deeds, and well acquainted with conditions in the area claimed affected, gave as his opinion that there was no difference in present agricultural enterprises than past ones before the city started pumping.    Of like purport is the testimony of more than 20 witnesses sworn by the defendant, which must be and is more or less convincing of the facts as found by the chancellor.

For the plaintiffs, in addition to those previously mentioned, many practical men, with varying degrees of knowledge of and experience with muck lands, testified to the necessity of water in the soil, and the injury to it by its removal.    Some of the plaintiffs and many others swore that, since pumping had begun, the surface land had been robbed of its moisture, the wells lowered or ruined entirely, and irrigation made impossible.    We have reviewed all of this testimony and given it careful consideration, and after so doing have concluded that the chancellor was right in his finding, as a matter of fact, that plaintiffs have sustained no damage by the operation of defendant's pumping station, and that the recession of the flowing wells was not satisfactorily shown to have happened from other than natural causes.

Plaintiffs take exceptions to the action of the trial judge in making personal inspection of the premises and conducting individual investigations upon which he based his opinion, and they insist his conclusions should not be considered by this court.    Upon the

trial both sides consented to the court viewing the premises.    If, in his zeal to arrive at the correct conclusion, he gave it more attention than one visit would permit, such action should not become a matter for criticism.    But the case is tried here *de novo,* and disregarding the statement in the opinion of the chancellor, that he has made "innumerable personal inspections" of the land, we feel that plaintiffs' action is without merit, and that their bill should be dismissed.

The decree of the lower court is affirmed, with costs to defendant.

SHARPE, C. J., and BIRD, STEERE, FELLOWS, and CLARK, JJ., concurred.    WIEST and MCDONALD, JJ., concurred in the result.